UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MOHAMED BELAKHDHAR,

Defendant.

Case No. 18-20072-2

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

MAGISTRATE JUDGE ANTHONY P. PATTI

_____/

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [20]**

On February 6, 2018, Defendant Mohamed Belakhdhar was charged with Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances in violation of 21 U.S.C. §§ 846, 841(a)(1). On April 2, 2018, Mr. Belakhdhar filed a Motion to Suppress Evidence [20]. The Government filed a Response [22] on May 4, 2018. The Court held a hearing on the Motion on May 15, 2018 at which it requested supplemental briefing.

Because the stop of Mr. Belakhdhar's vehicle was not supported by probable cause or reasonable suspicion of criminal activity, his Motion to Suppress [20] is **GRANTED**.

## STATEMENT OF FACTS

On January 23, 2018, Michigan State Police Trooper, Michael Daniels, was patrolling the freeway on I-94 in a marked patrol vehicle. It was drizzling, cold, and windy. That morning, Daniels was contacted by his supervisor, Sergeant Patino, regarding a DEA investigation. The DEA had advised Sgt. Patino that it had received a tip from a Confidential Informant ("CI") one day prior, that a person named Henry Soto would be transporting a large quantity of heroin in a Toyota Camry from Chicago to Detroit.

On the morning of January 23, 2018, DEA team members were stationed on I-94 to perform surveillance to locate the Camry. The DEA identified a black Camry, with an Illinois license plate, heading east on I-94. The DEA also observed a second vehicle, a Toyota RAV-4, traveling at approximately the same speed, and changing lanes at the same time, as the Camry. The RAV-4 had a temporary Illinois license plate.

Prior to locating the Camry, the DEA did not have any information to suggest that the Camry would be traveling with another vehicle. However, based on the fact that the Camry and RAV-4 were driving "in tandem," the DEA concluded that the drivers of the two cars were working together. As a result, the DEA contacted the

Michigan State Police and requested that traffic stops be conducted on both the Camry and the RAV-4.

Sgt. Patino instructed Trooper Daniels to stop the RAV-4. At approximately 9:48 AM, Daniels located the RAV-4 traveling eastbound on I-94. When Daniels first observed the RAV-4, the car was traveling at the 70 mph speed limit. Daniels pulled up next to the RAV-4 and continued to drive alongside the vehicle to "observe the occupants and to make sure that it was the correct vehicle." Hr'g Tr. 32:12-13, May 15, 2018. The RAV-4 slowed down as Daniels pulled up next to it. Daniels then got behind the vehicle. At that point, the RAV-4 was traveling at 53 mph. Daniels turned on his lights to effectuate a stop. Daniels testified that he "pulled the vehicle over because it was part of the investigation and also did have a clear traffic violation that [he] observed." *Id.* at 33:1-2.

After stopping the RAV-4 near exit 133 on I-94, Daniels approached the vehicle and spoke with the driver, Defendant Mohamed Belakhdhar. There was also a passenger, Amber Johnson, in the vehicle. Both parties provided identification to Daniels. Mr. Belakhdhar indicated that he was traveling from Chicago to Detroit to visit someone in the hospital. Daniels asked to search the vehicle, to which Mr. Belakhdhar consented. The search did not reveal any contraband. Daniels released the vehicle and Mr. Belakhdhar continued heading east to Detroit.

The DEA maintained surveillance on the RAV-4. After Daniels concluded the traffic stop, Shawn Koltuniak, a Border Patrol Agent who works with the DEA task force, ran an immigration search on the ID Mr. Belakhdhar provided to Daniels. Based on that database search, the DEA determined Mr. Belakhdhar did not have lawful immigration status. The DEA communicated this information to Border Patrol and requested that a Border Patrol agent stop the RAV-4 "on the immigration bounce," *id.* at 28:20-22, should an agent observe the vehicle.

Around approximately 11:30 AM, Border Patrol Agent, Benjamin Wolf, received information from his supervisor that an illegal alien was driving a RAV-4 with a temporary Illinois plate. At 1:00 PM, Agent Wolf located the RAV-4 exiting I-375 in Detroit. Agent Wolf performed a vehicle stop based on the suspected immigration violation. Border Patrol Agent Daniel Reed, who was driving in a separate marked vehicle behind Agent Wolf, assisted with the stop.

Mr. Belakhdhar gave Agent Wolf his Illinois state ID. Upon Wolf's request, Mr. Belakhdhar told Wolf that he was a citizen of Tunisia. Wolf conducted a records check which revealed that Mr. Belakhdhar's 2009 application for lawful immigration status had been denied. Wolf then performed a fingerprint check to confirm that, in 2000, Mr. Belakhdhar entered the United States on a visa which had since expired.

While Wolf was questioning Mr. Belakhdhar about his immigration status, Agent Reed asked to conduct a canine search of the RAV-4. Mr. Belakhdhar declined. Reed proceeded to walk the dog around the exterior of the vehicle. The dog alerted to the back bumper. Reed, along with a DEA agent on the scene, removed all items from the trunk and spread them out to allow for the dog to sniff each item individually. The dog alerted to a microwave box which contained a microwave. The agents opened the microwave and found two kilograms of heroin. The agents arrested Mr. Belakhdhar and transported him to the DEA for processing.

## ANALYSIS

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. Amend. IV. "An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). To lawfully stop a vehicle, an officer must have either probable cause of a traffic violation or reasonable suspicion of ongoing criminal activity. *Id.* The exclusionary rule requires suppression of evidence seized during or following an illegal stop. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citing *Blair*, 524 F.3d at 748).

**I.      Trooper Daniels did not have probable cause to believe Mr. Belakhdhar had committed a traffic violation**

Mr. Belakhdhar argues that the first stop on I-94 was invalid because it was pretextual. Mr. Belakhdhar contends that Trooper Daniels stopped him not for a traffic violation, but for suspected drug activity at the request of the DEA. The Government argues that because Trooper Daniels observed Mr. Belakhdhar commit a traffic violation – driving 2 mph below the minimum speed limit – he had a lawful basis for the stop and, as such, his subjective intent to stop Mr. Belakhdhar for suspected drug activity is irrelevant.

"[T]he legality of a traffic stop turns on the validity of the officers' objective explanation for making the stop, not on the subjective intentions of the officers in initiating the stop." *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003) (citing *Whren v. United States*, 517 U.S. 806, 806 (1996)). Consequently, where an officer stops a person based on probable cause to believe he has committed a traffic violation, the stop may not be rendered invalid "on the ground that the officer[] stopped the car for 'pretextual' reasons." *Id.*

In this case, when Daniels spotted the RAV-4 on I-94, Mr. Belakhdhar was driving the speed limit and was otherwise in compliance with the traffic code. Daniels was in a marked patrol car. Only after Daniels pulled up alongside the RAV-4 to examine the driver, and ultimately fell behind the RAV-4 to continue to follow it, did Mr. Belakhdhar slow his speed to 53 mph.

The Government maintains that Daniels was justified in pulling over Mr. Belakhdhar because he observed him drive 53 mph on a section of I-94 in which the minimum posted speed limit was 55 mph.

This argument is unavailing, where, as here, the officer himself created the alleged traffic violation to justify the stop of the vehicle. *See United States v. Jorge Nieblas-Cordova*, No. CR071460TUCFRZHCE, 2008 WL 4368934, at *5 (D. Ariz. Sept. 24, 2008) (citing *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1124 (9th Cir. 2002)). Mr. Belakhdhar slowed down only after he saw a marked patrol car driving next to him for nearly one minute, operated by an officer in uniform peering into his vehicle. Had Daniels not pulled up alongside Mr. Belakhdhar, presumably, he would have continued to drive the speed limit.

Furthermore, even if Daniels hadn't created the alleged violation on which he bases the stop, the Michigan Vehicle Code does not prohibit Mr. Belakhdhar's conduct. M.C.L. § 257.627(1) provides: "A person operating a vehicle on a highway shall operate that vehicle at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface, and width of the highway and of any other condition existing at the time."

The presence of a marked state police vehicle, especially one that is moving at a high speed immediately adjacent to a civilian-driver, is a condition on which it

is entirely reasonable and proper for the driver to rely upon when choosing to operate his vehicle below the minimum speed limit. *See United States v. Coronado*, 480 F. Supp. 2d 923, 928 (W.D. Tex. 2007) (noting that "[i]t is neither abnormal nor dangerous driving behavior for a driver to slow down with the approach of a law-enforcement vehicle."). Surely, most responsible drivers slow down when they see an ambulance, fire truck, or police car on the highway. Not only is it sensible, it is the safest thing to do to avoid obstructing the vehicle in the event of an emergency.

Because Mr. Belakhdhar was driving in compliance with the Michigan Vehicle Code, and because any suspected violation of the Code was caused by the State Trooper himself, the Government's attempt to rely on the alleged traffic violation as a justification for the stop is futile.

## II. Law enforcement did not have reasonable suspicion to believe Mr. Belakhdhar was engaged in drug activity

"The Fourth Amendment permits brief investigative stops—such as the traffic stop in this case—when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014). "The officer 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Based upon [the totality of the circumstances,] the detaining

officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). "Pertinent circumstances include the officer's own direct observations, dispatch information, [and] directions from other officers[.]" *Lyons*, 687 F.3d at 763 (internal citation omitted).

Seeing as it is undisputed that Daniels was authorized to conduct a stop based on information from the DEA, *see id.* at 765-66, the issue before the Court is whether, based on the totality of the circumstances, the officers collectively had reasonable suspicion to justify the stop.

The Government highlights the investigation of Henry Soto and his involvement with suspected drug activity as grounds for reasonable suspicion of Mr. Belakhdhar. However, the Government overlooks the fact that until the DEA agents witnessed the Camry and the RAV-4 driving in tandem, law enforcement had no reason to suspect that Mr. Belakhdhar had been involved any criminal activity. The CI did not mention Mr. Belakhdhar's name, nor did he say that Henry Soto might be traveling with someone.

Essentially, the Government piggy-backs the justification for the stop of the RAV-4 on the justification for the stop of the Camry. But, this runs contrary to the Supreme Court's instruction on particularity – the officer must provide a basis for

suspecting Mr. Belakhdhar, not Henry Soto, of criminal activity. Mr. Belakhdhar's "mere propinquity" to Henry Soto on I-94 "does not, without more, give rise to probable cause" or reasonable suspicion. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (internal citation omitted).

The Court considers the following circumstances in its analysis of the legality of the stop of the RAV-4 on I-94:[1] Upon tracking the Camry on I-94, the DEA agents observed a RAV-4, changing lanes with the Camry at a distance of a few car lengths apart, for an unspecified period of time.[2] The RAV-4 had a temporary Illinois license plate. The RAV-4 was operating in compliance with the traffic code, until a uniformed state trooper in a marked patrol vehicle pulled up next to it. The RAV-4 slowed down when it saw the marked police vehicle. This took place at 9:48 AM on January 23, 2018, when it was cold, windy, and drizzling.

The Government relies on *United States v. Sharpe*, 470 U.S. 675 (1985) to support its argument that the fact that the RAV-4 was traveling in tandem with the

---

[1] For purposes of this Motion, the Court assumes that the DEA had reliable information that Henry Soto was transporting drugs in a Toyota Camry from Chicago to Detroit, and therefore, had reasonable suspicion to believe Henry Soto was involved in criminal activity.

[2] In its brief, the Government submits that the Camry and the RAV-4 were traveling in tandem for 20 minutes; however, the testimony at the hearing does not support this assertion.

Camry gave the officers reasonable suspicion that the two vehicles were working together.³ However, tandem driving with a vehicle suspected of drug activity, alone, is an insufficient basis for reasonable suspicion. *See United States v. Carrillo-Alvardo*, 558 F. App'x 536, 543 (6th Cir. 2014); *see also United States v. Espino-Urvan*, No. 12 CR 337 LTS, 2013 WL 2255953, at *6 (S.D.N.Y. May 21, 2013) (internal citations omitted) (noting that "[i]n most other cases in which a court has held that the fact that two vehicles were traveling 'in tandem' provided probable cause for the arrest of a driver or the seizure of evidence, there were other facts cited in support of the probable cause determination."); *United States v. Vargas-Calva*, 9 F.3d 1555 (9th Cir. 1993) ("The fact that vehicles are travelling in tandem may support a finding of reasonable suspicion, but only in combination with other probative factors.").

In *Carillo-Alvarado*, the Louisville Police received a reliable tip that a tractor-trailer carrying marijuana would be delivered to an auto-shop. *Id.* at 538. The officers began surveillance on the auto-shop and witnessed containers being unloaded. *Id.* at 539. Thereafter, the officers saw two white cargo vans, two minivans, and a sedan

---

³ In *Sharpe*, the Supreme Court noted that there was sufficient reasonable suspicion to justify the stop where the agent observed the defendant's camper, which had its windows covered with bed sheets, driving in tandem with another vehicle in a high crime area. *Id.* at 728 fn.3.

leaving the shop. *Id.* The officers followed the vehicles and observed the defendant's minivan driving in tandem with one of the cargo vans over the course of a few miles. *Id.* at 540. When the officer signaled for the defendant to pull over, he continued driving for a quarter of a mile. *Id.* The officer searched the minivan and discovered 2.5 kilograms of marijuana. *Id.*

The defendant filed a motion to suppress the evidence seized on the grounds that the officer lacked reasonable suspicion to stop his vehicle, which the district court denied. *Id.* at 541. In affirming the district court's ruling, the Sixth Circuit explained that, taken together, the informant's tip, two-year investigative history, unloading of the trailer at night at a suspected drug distribution location, and vehicles driving in tandem fulfilled the reasonable suspicion requirement. *Id.* at 543.

Similar to *Carillo-Alvardo*, the Court considers tandem driving as one factor among many in its determination of whether the officers had reasonable suspicion. However, the additional factors which supported the Court's ruling in *Carillo-Alvarado* are not present here. Unlike *Carillo-Alvarado*, where law enforcement had been investigating for two-years, in this case, the DEA had been conducting its investigation for only one day prior to apprehending a suspect. More importantly perhaps, the officers in *Carillo-Alvarado* saw the defendant's car leave the auto-shop – a suspected drug distribution location – at night, whereas here, the DEA first

identified Mr. Belakhdhar's car driving on a busy highway during the day, primarily on the basis that it had been changing lanes with the Camry. Furthermore, that the RAV-4 had a temporary Illinois plate carries little weight, since vehicles with temporary Illinois plates travel on I-94 every day.

Considering the totality of the circumstances, the Court cannot conclude that the officers had reasonable suspicion that the RAV-4 was engaged in drug trafficking activity. The Government impermissibly uses tandem driving as the primary basis for the stop, piling hunch upon hunch to support its argument that the seizure of Mr. Belakhdhar was lawful. *See Carrillo-Alvardo*, 558 F. App'x at 543 (noting that tandem driving was neither the primary nor the only basis for the stop). Ultimately, Mr. Belakhdhar was stopped and searched – twice – based on a hunch that he could be involved in criminal activity with Henry Soto.

## CONCLUSION

The first stop of Mr. Belakhdhar's RAV-4 on I-94 was unreasonable because the officers had neither probable cause of a traffic violation nor reasonable suspicion to believe he was engaged in criminal activity. Because the seizure of his vehicle violated Mr. Belakhdhar's rights under the Fourth Amendment, the evidence

obtained from the second stop of his vehicle in Detroit is inadmissible as fruit of the poisonous tree.[4] *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence [20] is **GRANTED**. The evidence seized by the DEA and Border Patrol on January 23, 2018 cannot be used at trial against Defendant Mohamed Belakhdhar.

**SO ORDERED**.

|  |  |
|---|---|
| | s/Arthur J. Tarnow |
| | Arthur J. Tarnow |
| Dated: July 3, 2018 | Senior United States District Judge |

---

[4] Because the first stop of Mr. Belakhdhar was unlawful, the Court, does not, and need not, address the legality of the second stop by Border Patrol.